2005 UT App 294

**FOREST MEADOW RANCH PROPERTY OWNERS ASSOCIATION, L.L.C.,** Petitioner and Appellant,

v.

**PINE MEADOW RANCH HOME ASSOCIATION** aka Pine Meadow Ranch Home Owners Association and as Pine Meadow Ranch Association, Respondent and Appellee.

No. 20040397–CA.

Court of Appeals of Utah.

June 30, 2005.

Rehearing Denied July 19, 2005.

Boyd Kimball Dyer, Salt Lake City, for Appellant.

Edwin C. Barnes and Walter A. Romney, Jr., Salt Lake City, for Appellee.

Before Judges BENCH, GREENWOOD, and JACKSON.

## OPINION

GREENWOOD, Judge:

¶ 1 Petitioner Forest Meadow Ranch Property Owners Association, L.L.C. appeals the trial court's grant of Respondent Pine Meadow Ranch Home Association's motion for summary judgment. Specifically, Petitioner argues that, as a matter of law, Respondent's lien is unenforceable because (1) the 1971 Covenants, Conditions, and Restrictions (the 1971 CC & Rs), as the basis for the lien, violate Utah's statute of frauds, *see* Utah Code Ann. § 25-5-1 (1998); (2) the doctrine of descriptio personae applies; (3) the 1971 CC & Rs do not run with the land for want of privity; (4) the beneficiary of a trust may not encumber trust property; (5) the doctrine of uniformity applies; and (6) the lien violates Utah's Wrongful Lien Statute, *see* Utah Code Ann. §§ 38-9-1 to -7 (2001). We affirm.

## BACKGROUND

¶ 2 The essential facts are not disputed. In 1965, F.E. and M.P. Bates executed a duly recorded warranty deed (the Bates Deed), conveying land, part of which later became known as the Forest Meadow Subdivision,[1] to Security Title Company (Security). In the Bates Deed, Security was listed as "trustee," but no beneficiary or trust was described.

¶ 3 On March 18, 1971, W. Brent Jensen (Jensen)[2] created Deseret Diversified Development, Inc. (Deseret) by filing its articles of incorporation with the Secretary of State.

¶ 4 On July 8, 1971, Deseret, identifying itself as the "owner" of the "described premises"—"The South half of Section 22, Township 1 South,[[3]] Range 4 East, Salt Lake Base and Meridian"[4]—executed the 1971 CC & Rs. The 1971 CC & Rs were signed by Jensen, as president of Deseret, and stated that "[t]he reservations and restrictive covenants herein set out are to run with the land." While the 1971 CC & Rs make no specific reference to annual homeowners association assessments, they do provide for a homeowners association to administer and enforce the 1971 CC & Rs.

¶ 5 Later in 1972, Deseret and Security, described as owners, recorded Forest Meadow Ranch Plat "D" (Plat D). Plat D created the Forest Meadow Subdivision and marked the boundaries of Lot 105.

¶ 6 On January 15, 1975, Security conveyed title to Lot 105, by special warranty deed, to Jensen Investment. Jensen Investment took the deed "[s]ubject to easements, restrictions, reservations and rights of way appearing of record or enforceable in law and equi-

---

1. Another portion of the land transferred in the Bates Deed became the Pine Meadow Subdivision. At some point, the homeowners associations of the Forest Meadow Subdivision and the Pine Meadow Subdivision merged, thereafter operating as a single entity. It appears that their merger resulted in an unincorporated association rather than a corporation or other business entity.

2. Jensen wore many hats. For instance, he was president of both Security and Deseret, as well as developer of both the Forest Meadow and Pine Meadow Subdivisions.

3. "Township 1 South" was an incorrect description. The relevant property should have been described as "Township 1 North." Later, on August 19, 1971, to correct this error, Jensen rerecorded the 1971 CC & Rs altered only to reflect the appropriate description. The rerecorded 1971 CC & Rs were properly stamped and referenced the book and page numbers of the original recording.

4. Petitioner's property—Lot 105A—is partially within the north half of Section 22, Township 1 North, Range 4 East, Salt Lake Base and Meridian and partially within the south half of the same.

ty." This deed was recorded January 16, 1975. That same day, Jensen Investment conveyed by warranty deed the eastern half of Lot 105—Lot 105A—to C.E. and S.M. Clark (the Clarks), only to have the Clarks quitclaim Lot 105A back to Jensen Investment. It is alleged that the design of this transaction was to recombine Lot 105; however, it is unclear from the record what Jensen Investment gained by this transaction.

¶ 7 On July 22, 1975, Jensen Investment conveyed Lot 105A to H.E. and M.C. Waldhouse (the Waldhouses) by warranty deed. This deed was recorded July 23, 1975.

¶ 8 In 1980, Respondent recorded a notice of lien (the 1980 Notice of Lien), citing the 1971 CC & Rs, and claiming that Lot 105A, among others, had a "continuing lien" against it "for the payment of annual maintenance assessment[s]."

¶ 9 On December 12, 1988, the Waldhouses conveyed Lot 105A to S.J. Oakanson aka S.J. Liftos by warranty deed, but reserved Lot 105A's oil, gas, and mineral rights. This deed was recorded December 13, 1988.

¶ 10 On October 15, 1998, S.J. Oakanson granted Lot 105A to Axel Grabowski by warranty deed, "subject to easements, restrictions and rights of way currently of record." This deed was recorded October 29, 1998.

¶ 11 On December 9, 1999, Axel Grabowski quitclaimed Lot 105A to Petitioner—an "association" consisting solely of Axel Grabowski. This deed was recorded December 10, 1999.

¶ 12 In 2003, Respondent recorded a clarification to the 1980 Notice of Lien (the 2003 Clarification), submitting that the 1980 Notice of Lien created no new lien, but rather, merely republished the existing CC & Rs.

¶ 13 Respondent currently has an annual budget of approximately $140,000, consisting mostly of proceeds from annual homeowners assessments on over 800 lots. Respondent claims that it uses this money to provide its members benefits, such as maintaining and insuring private roads, open spaces, and power lines throughout the subdivisions. Respondent also contends that membership in the homeowners association is mandatory via the 1971 CC & Rs.

¶ 14 Petitioner, seeking to avoid Respondent's assertion of authority over Lot 105A, originally filed an action for summary relief under the Utah Wrongful Lien Statute, see Utah Code Ann. §§ 38-9-1 to -7, arguing that Deseret did not have any interest in the property when it recorded the 1971 CC & Rs. Thereafter, the parties conducted discovery. In late 2003, the parties asked the trial court to determine the case on summary judgment, indicating that there were "no facts to try." In 2004, the trial court granted Respondent's motion for summary judgment and denied Petitioner's like motion.

¶ 15 In the course of reviewing Respondent's proposed judgment, Petitioner discovered the discrepancy between the originally recorded 1971 CC & Rs and the rerecorded 1971 CC & Rs—"Township 1 South" on the original 1971 CC & Rs and "Township 1 North" on the rerecorded CC & Rs. Petitioner thereafter referred to the rerecorded CC & Rs as the "Fabricated 1971 CC & Rs," and brought a second motion for summary judgment on the grounds that the rerecorded CC & Rs were invalid, and thus, Lot 105A was not within the description of the 1971 CC & Rs. The trial court denied Petitioner's second motion for summary judgment. Petitioner appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 16 Petitioner appeals the trial court's grant of Respondent's motion for summary judgment. Summary judgment is proper only when there is no genuine issue of material fact and "the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). When reviewing a trial court's grant of a motion for summary judgment, this court reviews for correctness, giving no deference to the trial court's conclusions of law, and considers all evidence and reasonable inferences derived therefrom in the light most favorable to the losing party below. See Black v. Allstate Ins. Co., 2004 UT 66, ¶ 9, 100 P.3d 1163.

## ANALYSIS

¶ 17 Arguing that the trial court erred in granting Respondent's motion for summary judgment, Petitioner asserts that, as a matter of law, Respondent's lien is unenforceable because (1) the 1971 CC & Rs violate Utah's statute of frauds, *see* Utah Code Ann. § 25-5-1; (2) the doctrine of descriptio personae applies; (3) the 1971 CC & Rs do not run with the land for want of privity; (4) the beneficiary of a trust may not encumber trust property; (5) the doctrine of uniformity applies; and (6) the lien violates Utah's Wrongful Lien Statute, *see* Utah Code Ann. §§ 38-9-1 to -7.

### A. Utah's Statute of Frauds

 ¶ 18 In the instant case, we encounter a correction that modifies previously filed CC & Rs. "Because covenants that run with the land must be based on some interest in land, the statute of frauds must be satisfied." *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 629 (Utah 1989) (footnote omitted). Likewise, a correction to a covenant running with the land must also satisfy the statute of frauds. *See R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 13 n. 4, 40 P.3d 1119 (noting "that if an original agreement is within the statute of frauds, a subsequent agreement that modifies the original agreement must also satisfy the requirements of the statute of frauds to be enforceable.").[5]

 ¶ 19 Petitioner avers that Utah's statute of frauds prevents enforcement of the 1971 CC & Rs against Lot 105A, noting that the 1971 CC & Rs were originally recorded with an error in the description of the affected property—"Township 1 South." While Deseret later rerecorded the 1971 CC & Rs with the proper description—"Township 1 North"—Petitioner claims the rerecorded 1971 CC & Rs violated the statute because they were identical to the originally recorded 1971 CC & Rs save the first page, which corrected the description. Therefore, Petitioner claims that the signature appearing on the rerecorded 1971 CC & Rs applied only to the original 1971 CC & Rs, and thus, did not satisfy the statute of frauds's subscription requirement.

¶ 20 Respondent counters that the rerecorded 1971 CC & Rs merely corrected a scrivener's error, and this was deemed an acceptable remedy by the Summit County Clerk.

¶ 21 Utah's statute of frauds states:

No estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

Utah Code Ann. § 25-5-1. Because the rerecorded 1971 CC & Rs were no doubt in writing, if they were subscribed by Deseret, then the statute of frauds is not an impediment to their enforcement.

 ¶ 22 "Subscribed" generally means physically signed. *See* Black's Law Dictionary 1441 (7th ed.1999) (defining "subscription" as "[t]he act of signing one's name on a document."). Ultimately, subscription requires covenants to have attached to them a signature of an authorized party, thereby authenticating the document. It does not matter that the signature was originally put to paper for another document. *See* 72 Am. Jur.2d *Statute of Frauds* § 273 (2001). What is essential, however, is that the signing party intend for the signature to have effect on the document to which it is attached. *See id.* Indeed, "[t]he statute may be satisfied by the act of the parties in adopting their signatures on an old contract to authenticate a new agreement." *Id.* (footnote omitted); *see also Prigge v. Olson*, 154 Neb. 131, 47 N.W.2d 344, 346–47 (1951) ("A

---

5. The Utah Supreme Court in *R.T. Nielson Co. v. Cook*, 2002 UT 11, 40 P.3d 1119, uses the term "modification." *Id.* at ¶ 13 n. 4. However, because a "correction" is "the act or an instance of making right what is wrong," Black's Law Dictionary 347 (7th ed.1999), and a "modification" is "a change to something," *id.* at 1020, it follows that a correction is a modification, although the reverse is not necessarily true.

signature to satisfy the statute of frauds may be on any appropriate writing placed there by the party to be bound or authorized, adopted, or appropriated by him with the intent, actual or apparent, to give force and effect to the writing.").

¶ 23 Here, there is no evidence or indication suggesting Deseret intended to deceive, mislead, or act fraudulently. Deseret adopted the original subscription in the rerecorded 1971 CC & Rs, evidenced by the presence of the original, as well as the new recordation information on the rerecorded 1971 CC & Rs. This historical recordation information on the rerecorded 1971 CC & Rs squares with the apparent intent of the signer—Jensen—to subdivide and develop the land granted in the Bates Deed. Indeed, the same party filed both the original and the rerecorded 1971 CC & Rs, both of which were accepted by the Summit County Clerk's office. Furthermore, there were no intervening actions. Thus, the rerecorded 1971 CC & Rs were validly subscribed, and therefore, withstand Petitioner's statute of frauds challenge.

### B. The Doctrine of Descriptio Personae

■ ¶ 24 "Descriptio personae" is a doctrine whereby a court disregards tangential titles added to a person's name or signature. *See TWN, Inc. v. Michel*, 2003 UT App 70, ¶ 8, 66 P.3d 1031 (defining "descriptio personae" as " 'the use of a word or phrase merely to identify or point out the person intended and not as an intimation that the language in connection with which it occurs is to apply to him only in the technical character which might appear to be indicated by the word' ") (quoting *Dann v. Team Bank*, 788 S.W.2d 182, 184 (Tex.Ct.App.1990)). This doctrine was validated by the Utah Supreme Court in *Boise Cascade Corp. v. Stonewood Development Corp.*, 655 P.2d 668 (Utah 1982). *See TWN*, 2003 UT App 70 at ¶ 9,.

¶ 25 Petitioner contends that Respondent shoulders the burden to show both that a trust existed and that descriptio personae does not apply to the Bates Deed—wherein Security took title as "trustee" without evidence of the existence of a trust or beneficiary. Petitioner continues that if descriptio personae applies, Security was the outright fee owner of Lot 105A, rendering any CC & Rs filed by Deseret unauthorized. Alternatively, Petitioner claims that if this court rules descriptio personae inapplicable, nevertheless, Deseret could not have been the intended beneficiary of any trust because Deseret was not incorporated until March 18, 1971, years after the execution and delivery of the Bates Deed.

¶ 26 Respondent, on the other hand, asserts that descriptio personae does not automatically shift the burden to it to show the trust's existence. Furthermore, Respondent claims that, descriptio personae notwithstanding, extrinsic evidence indicates Security was trustee for the benefit of interests that later became Deseret.

¶ 27 Both parties rely on *TWN*, 2003 UT App 70. In *TWN*, a grantor twice conveyed a parcel of real property. *See id.* at ¶¶ 3–4. In the first instance, the grantor, listing himself on the deed as "Richard Christensen, Trustee," conveyed the parcel to the defendant. *See id.* at ¶ 3. Later, the grantor, this time identifying himself on the deed only as "Richard Christensen," conveyed the parcel to the plaintiff. *See id.* at ¶ 4. The trial court granted the plaintiff's motion for summary judgment, reasoning that, in the first conveyance, the grantor did not convey his personal interest in the parcel; rather, the first "deed conveyed only whatever interest Mr. Christensen held on behalf of an unnamed trust, which was apparently nothing." *Id.* at ¶ 5 (footnote omitted). This court, however, reversed, ruling: "The unexplained use of the word 'trustee' on a real property deed does not, absent other circumstances suggesting the creation or existence of a trust, create a trust or implicate only a trust interest." *Id.* at ¶ 12. We went on to enumerate two, apparently exhaustive, methods for a trustee to overcome the descriptio personae presumption. *See id.* at ¶ 14. First, "[a] trustee-grantor should include on the deed such language as 'in my capacity as trustee for the XYZ trust.' " *Id.* "Alternatively, as the Utah Supreme Court suggested in *Boise Cascade Corp.*, [655 P.2d at 669,] a party may resort to extrinsic evidence to show that a trust was, in fact, intended." *TWN*, 2003 UT App

70 at ¶ 14. Absent a showing of one of these circumstances, "the presumption of descriptio personae will apply, and the · deed will operate as if the word 'trustee' were not there." *Id.* (emphasis omitted).

▉ ¶ 28 In this case, because Security did not include in the deed language such as "in my capacity as trustee for the XYZ trust," descriptio personae will presumptively apply unless Respondent presented sufficient extrinsic evidence to the trial court "to show that a trust was, in fact, intended." *Id.*

¶ 29 Here, unlike *TWN*, there were no competing title interests or claims when the 1971 CC & Rs were filed. Indeed, it is undisputed that Petitioner's title traces back to Security, which took title as "trustee." Additionally, Security is a title company, an organization that often holds title to property as trustee. *See, e.g., Timm v. Dewsnup,* 2003 UT 47, 86 P.3d 699 (designating a title company as trustee); *Embassy Group, Inc. v. Hatch,* 865 P.2d 1366, 1369 (Utah Ct.App. 1993) (same). Furthermore, in Plat D, Deseret was listed as subdivider and owner, and Security was identified as trustee and owner. While Jensen was certainly cavalier in his documentation, this extrinsic evidence is sufficient to overcome the presumption of descriptio personae. Because we determine that a trust was intended, we must next assess whether Deseret may be a beneficiary of that trust.

¶ 30 Generally, a private trust must have "a definite beneficiary." Utah Code Ann. § 75–7–402(1)(c) (Supp.2004). Respondent urges that the interests that later became Deseret were the same as the beneficiaries of the trust naming Security as trustee, and that those beneficiaries were sufficiently definite. Indeed, the facts appear to support this conclusion that Deseret was the beneficial owner despite the lack of comprehensive documentation. Jensen signed on behalf of both Security and Deseret; listed himself as president of Security and incorporator of Deseret; and utilized the term "trustee" only for Security. Moreover, Deseret signed the 1971 CC & Rs as beneficial owner and developer. Such evidence is consistent with a scheme in which Deseret would oversee the development of the property granted in the Bates Deed. As such, we conclude the word "trustee" on the 1971 CC & Rs, together with extrinsic evidence, reflect the existence of a trust, with Deseret as beneficiary.

## C. Privity of Estate

▉ ¶ 31 Petitioner next posits that the 1971 CC & Rs fail to run with the land for want of privity, and therefore, are unenforceable against Lot 105A.

▉ ¶ 32 "It is well-established that, if recorded, the documents setting forth the plat designations for general plan developments can have the effect of creating restrictive covenants that are binding on all subsequent development." *View Condo. Owners Assoc. v. MSICO, L.L.C.,* 2004 UT App 104,- ¶ 16, 90 P.3d 1042. As the CC & Rs in the instant case were recorded, they may create enforceable covenants that run with the land. "Further, although subsequent purchasers may not have had an interest in the property at the time that the general plan was enacted, the law holds that those purchasers are entitled to enforce any covenants that may have been validly created." *Id.* Thus, the fact that Respondent did not exist when the CC & Rs were created does not necessarily prevent Respondent from enforcing the CC & Rs.

▉ ¶ 33 At law, "[a] covenant that runs with the land must have the following characteristics: (1) The covenant must 'touch and concern' the land; (2) the covenanting parties must intend the covenant to run with the land; . . . (3) there must be privity of estate"; and (4) the covenant must be in writing. *Flying Diamond Oil Corp. v. Newton Sheep Co.,* 776 P.2d 618, 622–23, 629 (Utah 1989) (footnotes omitted). Petitioner challenges only the privity element.

▉ ¶ 34 "Privity of estate requires a particular kind of relationship between the original covenantor and the covenantee." *Id.* at 628. There are three types of privity of estate: (1) mutual—"a covenant arising from simultaneous interests in the same land"; (2) horizontal—"a covenant created in connection with a conveyance of an estate from one of the parties to another"; and (3) vertical—

"the devolution of an estate burdened or benefitted by a covenant from an original covenanting party to a successor." *Id.* When investigating the existence of privity, substance should prevail over technical form. *See id.* at 628 n. 13 (referencing *Neponsit Prop. Owner's Ass'n v. Emigrant Indus. Sav. Bank,* 278 N.Y. 248, 15 N.E.2d 793, 798 (1938)).

■■■ ¶ 35 "[P]rivity exists here on traditional grounds." *Id.* For instance, there is horizontal privity here because the 1971 CC & Rs were created in anticipation of subdividing and selling lots. Furthermore, vertical privity exists because Petitioner is a successor to the estate of the original covenanting parties.[6]

### D. Beneficiary's Power to Encumber Trust Property

■■■ ¶ 36 Petitioner next argues that because Deseret had only a beneficial interest in the land granted in the Bates Deed, Deseret could not encumber Lot 105A. However, Petitioner cites no authority stating that a beneficiary cannot encumber the trust res. In fact, there is authority to the contrary. *See Capital Assets Fin. Servs. v. Maxwell,* 2000 UT 9, ¶ 17, 994 P.2d 201 (holding beneficial interest in real property could encumber that interest). In any event, we will not lose sight of the forest for the trees. Deseret's actions were subsequently ratified by Security when Deseret and Security filed Plat D. As such, it is disingenuous to suggest that Security did not know about the 1971 CC & Rs because Deseret and Security were working together. Indeed, Security later transferred title to the lots to Deseret to develop, further manifesting their collaboration. In the end, the 1971 CC & Rs became contracts between the homeowners association and its members. Further, the homeowners association operated pursuant to its bylaws to make assessments; maintain and insure private roads, open spaces, and power lines; and provide other benefits to its members.

### E. Doctrine of Uniformity

¶ 37 Petitioner avers that the doctrine of uniformity prohibits the enforcement of the 1971 CC & Rs because they govern only the northern part of Lot 105A. However, the doctrine of uniformity has not been adopted in Utah. Furthermore, because Petitioner has not demonstrated a lack of sufficient uniformity among similarly situated owners, we need not address whether the doctrine of uniformity should apply in Utah.

### F. Wrongful Lien Statute

■■■ ¶ 38 Finally, Petitioner asserts that the 1980 Notice of Lien Respondent filed against Lot 105A is wrongful because it is not authorized by the 1971 CC & Rs. The 1980 Notice of Lien states that, based on the 1971 CC & Rs, Respondent "claims a continuing lien upon [Lot 105A among others] for the payment of annual maintenance assessment[s]." Thus, it appears that Respondent's lien was grounded in the 1971 CC & Rs, rather than the 1980 Notice of Lien itself. Therefore, the 1980 Notice of Lien merely republished the 1971 CC & Rs.

### CONCLUSION

¶ 39 First, the rerecorded 1971 CC & Rs were adequately subscribed because Deseret adopted the subscription from the original 1971 CC & Rs. Second, there is sufficient extrinsic evidence indicating the existence of a trust with Deseret as beneficiary to overcome the presumptive application of descriptio personae. Third, traditional notions of privity of estate exist, allowing the 1971 CC & Rs to run with the land. Fourth, Security, as trustee, ratified beneficiary Deseret's encumbrance of Lot 105A. Fifth, the doctrine of uniformity has not been adopted in Utah, and Petitioner did not allege facts sufficient to warrant an examination of the doctrine in this case. Finally, the 1980 Notice of Lien was not a new lien, but rather merely republished the existing 1971 CC & Rs.

¶ 40 Accordingly, we affirm the trial court's ruling.

---

**6.** "Vertical privity exists in all covenant situations except where a successor to the burdened or benefitted land is an adverse possessor or a disseisor." *Flying Diamond Oil Corp. v. Newton Sheep Co.,* 776 P.2d 618, 628 n. 12 (Utah 1989) (quotations and citation omitted).

¶ 41 WE CONCUR: RUSSELL W. BENCH, Associate Presiding Judge and NORMAN H. JACKSON, Judge.