2007 UT 2

Paul Howard PETERS, Plaintiff
and Petitioner,

v.

PINE MEADOW RANCH HOME ASSO-
CIATION aka Pine Meadow Ranch
Home Owners Association and as Pine
Meadow Ranch Association, Defendant
and Respondent.

Forest Meadow Ranch Property Owners
Association, L.L.C., Plaintiff and
Petitioner,

v.

Pine Meadow Ranch Home Association
aka Pine Meadow Ranch Home Owners
Association and as Pine Meadow Ranch
Association, Defendant and Respondent.

Nos. 20050806, 20050805.

Supreme Court of Utah.

Jan. 12, 2007.

Boyd Kimball Dyer, Salt Lake City, for plaintiffs.

Edwin C. Barnes, Walter A. Romney, Jr., Salt Lake City, for defendant.

DURRANT, Justice:

## INTRODUCTION

¶ 1 We granted certiorari in these two related cases to review the issue of whether the beneficiary of a trust has authority to impose binding covenants, conditions, and restrictions on real property held in trust. We decline to reach this issue, however, because petitioners' briefs in each case are replete with unfounded accusations impugning the integrity of the court of appeals panel that heard the cases below. These accusations include allegations, both direct and indirect, that the panel intentionally fabricated evidence, intentionally misstated the holding of a case, and acted with improper motives. Further, petitioners' briefs are otherwise disrespectful of the judiciary. Accordingly, we strike petitioners' briefs as containing irrelevant and scandalous matters in violation of rule 24(k) of the Utah Rules of Appellate Procedure, affirm the result reached by the court of appeals in each case, and assess attorney fees against petitioners' counsel. Because we have not considered the certiorari question in either case and have not taken the opportunity to review the merits of the court of appeals' decisions, we limit those decisions to their facts and deem them without precedential effect.

## BACKGROUND

¶ 2 These cases share in large measure a complex and interesting set of facts that,

because of the conduct of counsel (the same lawyer represented the petitioners in both cases), is made irrelevant to our resolution of either case. Accordingly, we give only a brief overview here. A more detailed recitation of the facts can be found in the court of appeals' opinions.[1]

¶ 3 In 1965, F.E. and Mae P. Bates deeded a large tract of land in Summit County to "Security Title Company" as "Trustee." Respondent Pine Meadow Ranch Home Owner's Association (the "Association") seeks to levy fees against each petitioner to maintain roadways and other improvements in subdivisions that were established on this tract of land and in which the petitioners now own property. The Association seeks to levy such fees against Petitioner Forest Meadow Ranch Property Owners Association, L.L.C. ("Forest Meadow") based on covenants, conditions, and restrictions ("CC & Rs") purportedly imposed by Deseret Diversified Development ("Deseret") in 1971. The Association seeks to levy such fees against Petitioner Paul Howard Peters based on CC & Rs purportedly imposed by Pine Meadow Ranch, Inc. ("PMRI") in 1973.

¶ 4 The petitioners brought these actions to have the CC & Rs declared invalid. In both cases, the district court granted summary judgment to the Association, concluding that the CC & Rs were effective based on various legal and equitable principles. The petitioners appealed, and the court of appeals affirmed the district court's determinations that Deseret and PMRI had the authority as beneficial owners to impose the CC & Rs.[2] The court of appeals also concluded that even if Deseret or PMRI had lacked such authority as beneficial owners, Security had ratified the CC & Rs as trustee.[3] We granted certiorari to consider whether Deseret and PMRI had the authority as beneficial owners to impose binding CC & Rs. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(a), (5).

¶ 5 In his briefs in support of Peters's and Forest Meadow's petitions for certiorari, and in his briefs to us following our grants of certiorari, counsel accuses the court of appeals panel that heard the cases below of judicial misconduct. This accusation stems largely from the court of appeals' statement that W. Brent Jensen signed a plat on behalf of both Deseret and Security.[4] The court of appeals erred in making this statement. In fact, W. Brent Jensen signed on behalf of Deseret, and Leo D. Jensen signed on behalf of Security. Based on this error, petitioners' counsel accuses the court of appeals panel of intentionally fabricating evidence. He further contends that the error was motivated by some improper motive. He offers no support for these accusations of impropriety beyond the mere fact that the error occurred.

¶ 6 Additionally, counsel accuses the court of appeals of misstating the holding in *Capital Assets Financial Services v. Maxwell*.[5] Indeed, the court of appeals did err in its interpretation of this case. But counsel goes beyond demonstrating the error. He contends that this error, too, was intentional and the product of an improper motive by the court of appeals. Again, he offers no support for this accusation beyond the purported error itself.

## ANALYSIS

¶ 7 Petitioners' counsel was fully entitled to note the factual error made by the court of appeals with respect to the signatories to the plat. Indeed, it was his obligation as an advocate to do so. So, too, was it fully appropriate for counsel to assert that the court of appeals had incorrectly interpreted the *Capital Assets* case. Indeed, to address

1. *Forest Meadow Ranch Prop. Owners Ass'n, L.L.C. v. Pine Meadow Ranch Home Ass'n*, 2005 UT App 294, ¶¶ 2–15, 118 P.3d 871; *Peters v. Pine Meadow Ranch Home Ass'n*, 2005 UT App 295U, paras. 4–9, 2005 WL 1530644.

2. *Forest Meadow*, 2005 UT App 294, ¶ 36, 118 P.3d 871; *Peters*, 2005 UT App 295U, para. 10, 2005 WL 1530644.

3. *Forest Meadow*, 2005 UT App 294, ¶ 36, 118 P.3d 871; *Peters*, 2005 UT App 295U, para. 6, 2005 WL 1530644.

4. *Forest Meadow*, 2005 UT App 294, ¶¶ 3 & n. 2, 30, 118 P.3d 871.

5. 2000 UT 9, 994 P.2d 201.

errors of fact and law is the very purpose of the appellate process. But to argue that a court has committed an error is one thing; to argue that a court has intentionally committed that error due to an improper motive is quite another. There is a light year's difference between an innocent mistake of fact or law and the intentional fabrication of evidence or the intentional misstatement of a holding.

¶ 8 Should a lawyer be faced with genuine judicial misconduct, there are appropriate avenues available for him or her to address it, both within the context of a particular case and in a separate proceeding before the Judicial Conduct Commission. To make bald and unfounded accusations of judicial impropriety in briefs filed with this court is not such an avenue. In so doing, counsel has overstepped the bounds of appropriate appellate advocacy.

¶ 9 Rule 24(k) of the Utah Rules of Appellate Procedure provides that "[a]ll briefs under this rule must be . . . free from burdensome, irrelevant, immaterial or scandalous matters. Briefs which are not in compliance may be disregarded or stricken, . . . and the court may assess attorney fees against the offending lawyer." [6] Counsel's unfounded accusations regarding the supposed improper motives of the court of appeals panel are irrelevant to the questions upon which we granted certiorari. Further, those accusations are scandalous in that they are defamatory and offensive to propriety.[7]

¶ 10 In his briefs, counsel argues that the court of appeals panel that decided these cases committed both legal and factual errors. As noted, it was fully appropriate for counsel to do so. But he has taken the additional step of claiming that these errors were intentional and the result of improper motives. In support of these accusations,

counsel offers nothing beyond the fact that the errors were made.

¶ 11 That unsupported accusations of this kind are inappropriate should have been apparent to counsel. Rule 8.2 of the Utah Rules of Professional Conduct provides that "[a] lawyer shall not make a public statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge. . . ." [8] Further, standard 3 of the Standards of Professionalism and Civility provides that "[l]awyers shall not, without an adequate factual basis, attribute to . . . the court improper motives, purpose, or conduct." [9] Finally, standard 1 provides that "lawyers shall treat all other counsel, parties, judges, witnesses, and other participants in all proceedings in a courteous and dignified manner." [10]

¶ 12 Counsel's briefs before this court in both *Forest Meadow* and *Peters* include a substantial amount of material that is offensive, inappropriate, and disrespectful, and his conduct in either case, standing alone, violates rule 24(k) and warrants the sanctions we impose. In *Forest Meadow*, these accusations include the following:

- Good judges never fabricate evidence because the actual evidence is the foundation for their decisions.
- [I]f judges start with decision [sic] they want to reach for reasons of prejudice, bias, corruption or whatever, and then work backwards to the evidence, they may fabricate the evidence they need to make their decisions plausible. Petitioner respectfully asks the Court to judge for itself what happened in this case.
- [The authoring judge] needed evidence to justify her decision that W. Brent Jensen was the trust beneficiary in 1965. There was no such evidence, so she simply fabricated it *sua sponte.*

---

6. Utah R.App. P. 24(k). When the briefs in these cases were filed in January 2006, this language was found in rule 24(j) of the Utah Rules of Civil Procedure. The rules have since been amended; however, this language remained the same and thus we cite to the current numbering of the rule.

7. *Merriam–Webster's Collegiate Dictionary* 1042 (10th ed.1998) (defining "scandalous" as "libel-

ous, defamatory" and "offensive to propriety or morality").

8. Utah R. Prof'l Conduct 8.2(a).

9. Utah Standards of Professionalism & Civility 3.

10. *Id.* 1.

- This was no innocent mistake.
- The Court might want to think about the question Petitioner's President asked when he read [the authoring judge's] opinion. "Everyone knows Brent Jensen was never president of Security Title, so why did she do this to me, is it because I'm German, is it because I'm not Mormon?" The only right way to deal with his "why" question is for this Court to grant certiorari and make it moot.
- [F]or the Court of Appeals to dispose of a case on the basis of prejudice, bias, corruption or any basis other than the actual evidence in the record was to deny Petitioner due process of law.
- The Court of Appeals then goes on to say that Security transferred title to the lots in Plat D to Deseret to develop, but that is another fabrication.
- No reasonable person could have drawn the Court of Appeal's holding from the actual holding of this Court. It is beyond the range of "innocent mistake" or even "negligent mistake." The truth is sometimes a matter of degree—as when the defendant claimed he didn't know the revolver was loaded when he accidentally shot his wife—six times.

  Petitioner respectfully asks this Court to think about the question of why the Court of Appeals so mischaracterized this Court's holding. The degree of falsity is on a par with its holding that W. Brent Jensen signed the plat for Security Title when the document was actually signed by Leo D. Jensen. Could any Utah judge write the words "[W. Brent] Jensen signed on behalf of both Security and Deseret" without reading the plat? Could any Utah judge write the words "holding beneficial interest in real property could encumber that interest" without reading this Court's opinion? If the Court of Appeals did read the plat and the opinion, why did it make these false statements? (Alteration in original).
- [T]he false claim that W. Brent Jensen signed the plat on behalf of Security Title originated with [the authoring judge].

. Courts of law sit in judgment on other professions. Suppose a doctor operated on "Leo D. Jensen" when the true patient was "W. Brent Jensen." The doctor might become the defendant in a court of law. Doctors are expert in medicine. What are judges expert in? Does what [the authoring judge] did in this case meet this Court's professional standards?

¶ 13 In *Peters*, counsel made similar accusations in his briefs, often using the same language as he did in *Forest Meadow*:

- Turning from the actual evidence to the evidence fabricated by the Court of Appeals,....
- This was no innocent mistake.
- The major point is that for the Court of Appeals to base its decision on evidence of its own fabrication denied Petitioner due process of law. The Court of Appeals so far departed from the accepted and usual course of judicial proceedings as to call for this Court to exercise its power of supervision.
- Petitioner respectfully asks the Court to step back from the Court of Appeals' false evidence and the confusion of its opinion....
- The first thing wrong with that statement is that it is the facts fabricated by the Court of Appeals that support that conclusion, not the actual facts.
- [Our prior briefs] discuss three instances of the Court of Appeals fabricating evidence. There are more.
- It appears that the Court of Appeals solved the problem by fabricating a new status for Respondent....

  A cynic would say that once a Court decides to fabricate evidence, there is no limit to the problems it can solve.
- So, if a court fabricates evidence, whether intentionally, negligently, or through innocent mistake, it destroys the moral premise of the legal system. A judge who fabricates evidence, even from a sincere motive to do justice in a particular case, has no moral standing whatsoever.

- No reasonable person could have drawn the Court of Appeal's holding from the actual holding of this Court. It is beyond the range of "innocent mistake" or even "negligent mistake." The truth is sometimes a matter of degree—as when the defendant claimed he didn't know the revolver was loaded when he accidentally shot his wife—six times.
- Petitioner respectfully asks this Court to think about the question of why the Court of Appeals so mischaracterized this Court's holding . . . why did it make these false statements?
- The Court of Appeals falsified the identity of the declarant of the 1973 CC & R's to create false evidence that there actually was a trust.

¶ 14 One need only read these excerpts to be convinced of the scandalous nature of counsel's briefs. Counsel seeks to justify his accusations, however, by arguing that just as Biblical prophets "hate[d] the sin but love[d] the sinner," "a lawyer [may] challenge what a lower court did in the strongest terms without fear that it will be taken as a personal attack." Accordingly, he makes the following claim: "Counsel for Petitioner criticize[ ] the Court of Appeals and [the authoring judge] for what they did. He did not make a personal attack."

¶ 15 Yet counsel's briefs are decidedly personal.[11] Counsel repeatedly alleges that the court of appeals, and specifically the authoring judge, "fabricated evidence." Counsel also asserts that the court of appeals' characterization of our *Capital Assets* case went beyond the range of "innocent mistake" or even "negligent mistake." These statements personally attack the integrity of the court of appeals panel, suggesting serious intentional misconduct. Indeed, at oral argument for *Peters*, counsel specifically admitted that he intended his briefs to raise the question of judicial misconduct.

¶ 16 In addition to the unsubstantiated accusations of misconduct, counsel also makes statements generally disrespectful to this court as well as the court of appeals. Moreover, the statements quoted above and the statements detailed below illustrate counsel's failure in each case to "treat . . . judges . . . in a courteous and dignified manner" as required by the Utah Standards of Professionalism & Civility.[12]

¶ 17 In *Forest Meadow*, counsel's disrespectful statements include the following:

- Frankly, Petitioner is worried that the conduct of the Utah Court of Appeals was so outrageous that this Court will deny certiorari to avoid embarrassment.
- To use the Court of Appeal's metaphor, most of the trees are not in the forest! Extending the metaphor, the Court of Appeals does not even recognize the forest.
- But, on a practical level, how many Californian hunters would come to Utah if Utah declared open season on hunting deer? And as a practical matter, what will happen if this Court declares open season on hunting elderly trust beneficiaries?
- It is ludicrous for the Court of Appeals to hold that being covered by CC & R's is no different from not being covered at all, and that Petitioner is not a "similarly situated" with itself.

¶ 18 In *Peters*, counsel also made the following disrespectful statements:

- Granting certiorari in these cases is necessary to restore the integrity of the Utah Judicial Department.
- Petitioner respectfully points out that unless this Court takes up the agency issue, it will give its approval to what it knows is a gross injustice.
- The holding of the Utah Court of Appeals cannot be defended on any moral or legal grounds. It is contrary to every principle of decency and law. But, and perhaps this is the decisive point, it could be avoided. This Court has the power to say "well, we did not grant certiorari with respect to that issue so

---

**11.** *See In re Westfall,* 808 S.W.2d 829, 832 (Mo. 1991) (holding that counsel's statements directed specifically at deciding judge's motivation and integrity were personal attacks).

**12.** Utah Standards of Professionalism & Civility 1.

we will not take it up no matter how immoral and illegal it may have been." But, it would amount to ratifying a falsehood.

- This Court has the power to avoid the issue, but it cannot avoid the moral responsibility. A play ground bully cannot justify beating up a weaker child by saying "I promised myself I would beat you, and it would be wrong for me to break my promise."

- I want to respond to [the alleged judicial misconduct] in terms of a recent news development with respect to a little town in Iraq called Haditha. And what's happened here is that news stories have come out that suggest that there is grave misconduct there—that some Marines went out of control and shot some innocent civilians. The response of the Marine Corps is immediately to start investigating, to immediately start an investigation. It doesn't make any assumptions because the Marine Corps is responsible for the conduct of the Marines.

    You, you five are like the Commandant of the Marine Corps. You are in charge of the judicial conduct of the State of Utah. If something happens that, and I think this is true here, that could possibly, even could possibly go beyond the normal course of error—

¶ 19 It is regrettable that petitioners' counsel has elected to present his argument in an accusatory, offensive, and disrespectful manner. Our opinion should not be viewed, however, as questioning counsel's competency to practice law. Indeed, in both cases counsel has exhibited a firm grasp of the legal principles that should have been at issue. Unfortunately, the substantial amount of objectionable content in his briefs made irrelevant the potentially sound legal arguments he was making.

¶ 20 In both cases, the egregiousness of counsel's conduct has led to sanctions that have directly caused a detrimental result for his clients. We take this occasion to note, however, that the detriment to clients' interests caused by such conduct is not limited to cases in which sanctions are imposed. Even where a lawyer's unprofessionalism or incivility does not warrant sanctions, it often will nevertheless diminish his or her effectiveness.

¶ 21 There is a misconception among some lawyers and clients that advocacy can be enhanced by personal attacks, overly aggressive conduct, or confrontational tactics. Although it is true that this type of advocacy may occasionally lead to some short-term tactical advantages, our collective experience as a court at various levels of the judicial process has convinced us that it is usually highly counterproductive. It distracts the decision-maker from the merits of the case and erodes the credibility of the advocate. Credibility is often directly tied to civility and professionalism. Judges, jurors, and other lawyers are more likely to believe a lawyer who is courteous and treats others with dignity and respect. Counsel in the case at bar would have been far more effective had he focused exclusively on the facts and the law without making his additional commentary disparaging and insulting the judiciary.

¶ 22 We have sought to encourage the bar to aspire to professionalism and civility in the practice of law through our adoption of the Standards of Professionalism and Civility. While these standards are not binding, we encourage members of the bar to study and follow them. Had counsel in the cases at bar observed these standards, he and his clients would not have incurred the severe sanctions we impose today.

## CONCLUSION

¶ 23 Counsel's briefs in both the *Forest Meadow* and *Peters* cases are replete with attacks on the integrity of the court of appeals panel that decided the cases below. Those attacks are unfounded, scandalous, irrelevant to the questions upon which we have granted certiorari, and disrespectful of the judiciary. Accordingly, pursuant to rule 24(k) of the Utah Rules of Appellate Procedure, we strike those briefs and assess attorney fees against petitioners' counsel. We remand to the district court for a determination of the amount of attorney fees incurred

by respondent in responding to petitioners' briefs to us following our grant of certiorari. We decline to consider the issues as to which we granted certiorari. Instead, we affirm the result reached by the court of appeals in both *Forest Meadow* and *Peters*, limit the court of appeals' decisions to the facts of each case, and deem the decisions to be without precedential effect.

¶ 24 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT'S opinion.